Our last case this morning is ECO Pharmaceuticals v. Slayback Pharma and Apotex, 2023-11-10. Mr. Garrett. Thank you, Judge Laurie. May it please the Court. For two independent reasons, the District Court's decision granting judgment for defendants should be reversed. First, the District Court's decision rests in the construction of the ready-to-use limitation that, as the defendant's own experts admitted, excludes all of the preferred embodiments in the patent and all that a must gain products generally, rendering the patent utterly inoperable. Whether viewed through the lens of claim construction or clear error, that result is untenable. Second, the District Court erroneously Until we get to this appeal, you stipulated to this claim construction, right? Your Honor, we stipulated to a construction that ready-to-use meant minimal, if any, effort or preparation, which is the one that the patent examiner adopted. I mean, obviously, the patent examiner didn't adopt a construction that rendered the patent meaningless. And so what happened was, and this was made clear by the District Court's pretrial rulings in the Flaherty case and on the motion in limine here, is the District Court's understanding of that term shifted radically, so that after one day of trial on infringement, it adopted this construction that shifted from the level of effort to the level of risk inherent in a must-gain product generally. And that's what you're saying is the claim construction error, the shifting from error to risk. Exactly, Your Honor. And I think that the linear technology case illustrates that problem where the understanding of the term shifts in a manner that excludes examples. Well, you can call it a shift, and I think somewhere maybe you used the term that they conflated effort and risk. But it found that the risk involved meant that a person needed to be extremely precise, which in turn required more than minimal effort. How is that problematic under the construction? How is that reconstruing the claim? So it's problematic because it excludes all venomous team products. No liquid venomous team product qualifies as ready-to-use. The patent is inoperable. It's problematic because it shifts the District Court's own discretion. Are you saying it renders a patent indefinite? Inoperable. It covers nothing, Your Honor. There's no liquid venomous team product that is ready-to-use under that understanding, and the defendant's own expert admitted that. I'm sorry. The claims would cover nothing, or they would cover everything? Nothing. Is there a problem? Is there more than minimal effort required? Right. I'm sorry. Because the shift from effort to risk. And if you look at the question of further dilution, Your Honor, which is the District Court prior to the trial in this case, in the Solarity case involving the same patent and the same limitation, recognized that ready-to-use did not exclude further dilution. Yet under the District Court's decision in this case, and this is on page 13 of the statute, each step, including a dilution step, required more than minimal effort because of the inherent risks, and therefore rendered a product not ready to use. I mean, that's completely incompatible. You can't square that shift. Similarly, in its motion in limine ruling in which it denied the defendant's efforts to say our experts can't testify about a comparison between using the lyophilized powdered Benamustine that had to be reconstituted in a cumbersome process and using the concentrated liquid Benamustine that the District Court agreed with us. Yes. That comparison. He allowed that, right. He allowed that. And he allowed that because he recognized that a person of skill of the art would want to know the comparison in determining what was minimal. But all of that is irrelevant under the District Court's construction in its decision, and that's clear on page 14 of the appendix, where he said that the problem with Dr. Sewell's testimony was all he talked about, the gist of it, was a comparison, but that's not the relevant question. That's what he said. So, again, that shows the shift. But taking all of your points, why isn't this case correctly looked at? It was left to the experts to testify, and that's really a huge basis for it. And it seems to me that the experts, as well as the District Court, really did apply the stipulated claim construction. So if we're there, isn't he well within his authority to credit one expert versus the other? And he gave plenty of reasons in his opinion why he was – he didn't just say, I believe him and not him. He gave plenty of reasons why he thought Dr. Grant was more probative than the other expert. Why doesn't the case begin and end with that? Because, Your Honor, he found both experts credible. He even found our expert credible, and that's when they actually violated it. But the problem is that our expert talked about the level of effort and said that the effort in dispensing liquid bundle musting was minimal and trivial. Their expert came in and said, wait a second, this is an inherently dangerous product. Every step you take, even looking at the vial, and that's clear on page 12 of the appendix. Looking at this wrench, every single step is more than minimal because of the inherent risk in this product. And that is what creates the problem. That's a completely different way of looking at it. It means that the patent examiner was wrong in adopting this construction and improving this patent because under this understanding of the patent and the ready-to-use limitation, no bundle musting product qualifies. But going back to the experts, though, our review is minimal in terms of reviewing his assessment of the credibility and the quantity of research. And one of the things he lied on heavily, I think, was that the expert on the other side had done these injections hundreds of times, and so what he said carried more meaning than the expert on the other side, who had never done these injections and came from the U.K., which doesn't even allow this drug, right? So first of all, our expert was – that's right, Your Honor, he said that. Our expert was qualified. There was no dispute that he was qualified. Yeah, yeah, but that's – yeah. But the crux of this came down to Dr. Brandt, their expert's answer to this question. And this was on page 55379 of the appendix. Why aren't the steps minimal or trivial? And what he said is, quote, there's nothing minimal or trivial about compounding a highly toxic chemotherapy drug. And that's the reasons that the district court gives on page 13 of the appendix, paragraph 39, where he finds that these are minimal because – these are – these are not minimal because of the inherent risk in liquid benamustine products. And so, therefore, each step – and he's referring back to the steps on page 12 of the appendix, including just removing the vial's cap renders this not ready to use. That makes no sense. It means the patent is utterly inoperable. It means that the patent examiner who applied the same construction, which is based on medical dictionary definition, was wrong to approve this. It overlooks that we're looking at this from the standpoint of a person of skill in the art, which is someone who works in this sphere, who works in a clean room, who works in a glove box, who knows the inherent dangers. And the question for that person, is this liquid benamustine product that all I have to do is add a dilutant and then it's ready to dispense, ready to use, compared to the prior liophilized powdered version that had to be reconstituted in a 30-minute – 15 to 30-minute process that was inconvenient, which was the whole reason for the patent. And it's really this completely different way of looking at it, Judge Prost, that caused the district court to reach this conclusion. And it's evident in the district court's decision on page 13. And that doesn't come down to an issue of credibility. It comes down to a question of how you're looking at this claim limitation and we went from a world in which it was minimal effort, in which the district court recognized that a dilution step did not render a product not ready to use in its scolarity ruling, and in which, in order to determine what was minimal, you would look at a comparison to the world in which you used the powdered version that you had to reconstitute. We shifted entirely to a decision in which all that mattered was the inherent risk in the liquid benamustine product generally, in which a dilution step alone rendered a product not ready to use, and in which a comparison to the prior world of the powdered benamustine was irrelevant. And those are night and day. And whether you look at that as a conclaimed construction issue, which is, I think, analogous. Did you raise an objection to Applebee's experts' testimony? We didn't, Your Honor. And what happened was we had these pretrial rulings. I mean, look. The defendants themselves described their products to the FTA as ready to use. The patent examiner clearly thought there were liquid benamustine products that were ready to use when he approved this patent. The district court's pretrial rulings recognized that as well, that a dilution step didn't render it not ready to use and that you would compare it. It was comparative inquiry. It was only at trial, at the close of the first day of trial, that the district court, you know, adopted this radically different way of looking at it. We objected immediately to that, and here we are. And I think that the linear technologies case is an analogous case. There the court had a limitation which was monitoring the current, and the commission adopted an understanding of that that excluded improperly narrowed it so that it didn't cover measuring voltage, and the court said that that was wrong. Even though the court didn't say it was reconstruing the term, that was the effect. It changed the scope and meaning of it and improperly narrowed it. Here, the claim that the district court didn't only narrow the meaning of ready to use. It rendered it irrelevant. It rendered all liquid benamustine compositions not ready to use. At what point did you object to any of the evidence regarding that there was a minimal effort, the minimal effort issue? We didn't object, Your Honor. They were entitled to put in the evidence that they wanted to put in. But if it's getting away from claim construction, and it's contrary to claim construction, then shouldn't you object to it at that point? So they had their expert, they put on an expert, and during that expert's testimony he testified about the inherent risks in liquid benamustine products. It wasn't until the district court adopted that and said that was the reason that this was not minimal, that a comparison was irrelevant, and that a dilution step alone would render it not ready to use, contrary to his prior 183 different ruling before trial on that, that it became apparent that he had completely taken the ground from underneath the meaning of ready to use that the parties had stipulated. I'm just concerned that you may be facing a waiver issue here. With respect, Your Honor, I don't think there's any waiver at all. And again, I mean, think about the world as we understood it. The defendants themselves had described their products, which are generic products, to the FDA as ready to use. The patent examiner recognized that liquid benamustine products could be ready to use. It approved the patent. The district court itself, prior to trial, recognized that a dilution step did not render something not ready to use. You've now, I think, said twice about what the FDA did. Yes. But you had the chance at trial, did you not? I mean, the question at trial was when the FDA uses the term ready to use, is that synonymous with the stipulated construction? And I think the district court even chided your side for wanting to bring in the FDA so that they can give us the answer we need as to what the relevance is of what you're making today. And you didn't do that. So I think that imposed an improper burden on us, Your Honor. Your Honor, in this case, in the Parra Pharmaceutical v. Eagles case, dealt with the same situation. And there the Court said that the defendants' own statements to the FDA, recognizing that a claim limitation were met because of the way they characterized their product, were just positive controlling on the infringement inquiry. But even more than that, Your Honor, in the intendant's case, the Court recognized that FDA statements by a manufacturer show the ordinary meaning of the terms. So at a bare minimum, the fact that the defendants described their products as ready to use is consistent with the ordinary meaning of the term. We didn't have to come in and prove how the FDA understood that. That was really irrelevant. What matters is the... Well, doesn't it matter if the FDA construed it the way the stipulated construction construed it? Don't you think that matters? Not on this... If the FDA says, no, our view of ready to use is not consistent with what the stipulated construction of that term is. So I suppose if there were a regulation or something like that, Your Honor, there was nothing. There was silence here. And so what matters is the way the defendants used it because if this Court recognized an intendant, that... What matters is what the term... I mean, everybody from the get-go of prosecution, somebody figured they needed to define what ready to use meant in this particular context. And that's the stipulated construction that both parties agreed to. You're saying that we absolutely have to assume that that's precisely the definition that the FDA uses when it used that term in this context? So I think the question is a claim construction question of what's the ordinary meaning of the term. And the fact that the defendants themselves characterized their products as ready to use is reflective of the ordinary meaning, which is what this Court said in intendus. The district court prior to trial recognized that this was the ordinary meaning of ready to use when he refused to agree that a dilution step in itself would render it not ready to use. And that was on page 14652. So this is... Counsel? Counsel? Yes. Total time has just run out. We'll give you two minutes for rebuttal. Thank you. That's my fault. Thank you, Your Honor. Mr. Roelliger.  You may have pleased the Court. Eric Roelliger on behalf of the Apotex Defendants. EGLE got the trial it wanted under the claim construction that it repeatedly asked for, and it lost. The district court determined as fact that the defendants' Venda Mustang products cannot be dispensed with minimal effort or preparation due to the great care that has to be taken in preparing these cytotoxic products for administration. That holding is reviewed plainly for clear error. Well, let me ask you. I mean, one of the points that Mr. Garvey had to do with this, I guess, is Appendix 13 or whatever. It seemed like the trump card here and what pervaded it all is it didn't really matter what the steps were. It was the fact that we're dealing with a toxic drug and we're dealing with fragile cancer patients. So given those two factors, outside of anything else we're doing here, it's going to require more than minimal effort because of those circumstances. Is that the right way to look at this and to analyze this? Well, I think we have to analyze it within the context of the stipulated definition, which is to ask whether or not these products can be dispensed with and I think it's key to put that in the equation. Well, what if anybody stipulated that as we weren't dealing with cancer patients and we were dealing with a less toxic drug and we're dealing with the exact same steps, it would have required minimal effort. So those are the two variables in this context which take it out of that. Are you comfortable with that? I mean, yeah, I'm assuming you don't want to defend that. Well, I think at that point you are dealing with a very different case. I'm not sure I'm prepared to concede that even going through the 13 steps themselves, even if you're not doing it in a glove box and wearing a protective suit, which is what the facts were here, is minimal effort. But certainly within the context of these drugs and the definition that EGLE stipulated to repeatedly, I think the district court was well within its authority to look at the preparation that went into the dispensing process and say, yeah, that's not minimal. I have an expert up here who says he's dispensed this drug hundreds of times and it takes anywhere from 15 to 30 minutes. No, but I'm asking you, is there anything improper if I construe the district court as having said that everything about this that made it non-minimal had to do with the toxicity of the drug and the fragility of the patient? I don't think I would understand the district court's holding that way, Your Honor. I think that was certainly a big part of it. Is there anything wrong with that being a big part of it? No. Okay. Not at all. It's minimal effort or preparation. Because we're talking about this drug. That's what this case is about. The holding is specifically about this drug, the evidence that was presented at this trial and applying it to the definition that we all stipulated to. And Judge Rayna, I want to pick up on a line of questioning that you were asking about of whether or not there should have been an injection. I think it's really important to point out that there were no surprises when we went into trial. We were going in to have a battle of the experts to apply the stipulated definition. We had already gone through expert discovery, so we knew what these experts intended to say and how the parties intended to frame that testimony. And when you went in, I mean, Mr. Garr referred to the one-day trial and this went really quickly, but that was pre-set, right? The timing of this was all pre-set, right? I believe so, yes. It was supposed to be one day on infringement and one day on invalidity. And Judge Conley said that after he had heard the infringement evidence, he was convinced there was no infringement, so there's no need to go into invalidity. But that was the timeframe that was pre-established, just the one-day trial. Correct. Correct. Suppose that I have a concern about whether the court engaged in new claim construction as opposed to fact-finding analysis that informs the stipulated claim. What would you say to that? So my response would be to point you to this court's case in Versada, the upshot of which is that when there is an effective, when you have a stipulated construction to a term, everything after that becomes application. And insofar as there is a litigant who, after the fact, wants to add a negative limitation, which is effectively what my friend is asking you to do, that's a fact issue. Everything after that becomes fact. It's application. And I think Versada is particularly informative because there the question was whether or not source code could be viewed as computer information, which was the key limitation, the key definition in that patent. And I think there's a very highly, there's a very clear analogy here. We're talking about the effort, excuse me, the risk to the provider and to the patient in preparing these drugs and whether or not that is, whether that is probative of the effort and the preparation that go into the dispensing process. That's an application question. And that's a fact question in light of the stipulation. If EGLE thought that that testimony was going to stray beyond the bounds of the stipulated construction, they were obligated to raise their hand and say something. But they did the opposite. During the motion in Lemonade Proceedings, they argued vigorously, quote, the die is cast on claim construction. In their view, all that was left to do was to go to trial, let the experts duke it out, and for Judge Conley to make his fact finding. What about the FDA's use of the term, right? Sure. So let's go there. I think what EGLE is doing is they are taking a very basic legal proposition and stretching it to the point, well past its breaking point to attack findings of fact. The upshot of their argument is that they're upset that Judge Conley did not credit a couple of snippets out of a pre-NDA filing that used the words, ready to use, as illegally finding admission. Judge Conley was not required to do that. My friend cannot cite you to any proposition of law that requires that. What the law requires is to consider the totality of the FDA evidence and weigh it just like any other piece of evidence. And when you look at the totality here, I think it's important to point out that the labels, the proposed labels, do not say ready to use. Apotex specifically said in a later filing, our product is not ready to use. We explicitly disavow it. And then if you look at the totality of the references throughout the record, both of the defendants said ready to use. Are you saying that statements made to the FDA have no bearing? Not at all. Not at all. They do have bearing, but they don't have legally, unless it rises to some level of unambiguity that we do not have here, you consider the whole body of the FDA statements. But Judge Collier also kind of encouraged them to, well, bring in somebody else. I think he would have been persuaded if the FDA coming in said ready to use means and gives the definition of the stipulated construction, right? Sure. I think that is. I thought, maybe I'm misremembering, but I thought that was part of his, you know. No, that absolutely is a key part of his ruling. I think it's finding number 36 of his opinion. And I think the reason that he framed it in that way is because he was responding to EGLE's argument where they are trying to put legally dispositive weight on these one or two references. What about your friend's argument that this patent, under this construction patent covers nothing? So, I have two responses to that. Number one, when we're talking about what was held in this case, the only thing that was held here was that these particular products at issue required more than minimal effort and preparation. Whether or not that translates into something broader is for another day and another set of litigants. In terms of just practical reality of, you know, does it render the patent inoperable, my response to that is EGLE chose its definition. And during patent prosecution, they had the opportunity to use different claim language. The examiner explicitly offered them ready for further dilution. And they said, no, we want ready to use. And then in order to get over an indefiniteness objection by the examiner, they accepted this definition that was found on an online dictionary. So, insofar as that may render the patent inoperable, that is their own doing. And the fact that there was an allowance in this case is not dispositive because, I mean, the Peach Hill allows patents that are inoperable or invalid all the time. I mean, if that weren't the case, we wouldn't have much to do in this Court. Invalidity is not an issue. No, it's not. My only point is that my friends seem to suggest that the fact that there was an allowance in this case militates against construing the patent or, you know, understanding the patent in a way that might render it inoperable. And my point is that is not accurate. So the last point I'd like to make in my very brief remaining time is to address this notion about requiring the comparison of liquid to lyophilized bendamustine. And my only point for you there is that we're asking whether these products can be dispensed with minimal effort or preparation. Both sides agreed what dispensing is generally, and that is the process of taking what the manufacturer gives you and doing all of the steps in order to get it ready to administer for the patient. So when you're talking about bendamustine, that includes the reconstitution of the lyophilized product and the dilution of a liquid concentrate product. Judge Conley considered all of the parties' evidence on this front. He specifically considered Dr. Sewell's comparison and found it unpersuasive. That's finding number 32, appendix page 14. With that, I see my time has expired. And unless you have any further questions, I'm prepared to cease the podium. Thank you, counsel. Thank you. Ms. Buckner. Thank you, Your Honor. May it please the Court. I don't want to repeat much of what you heard. In the case here, the legal question and the factual question are very much intertwined. So what I would like to address is the argument that even if there was no new claim construction and the judge applied the stipulated construction, that he nonetheless got it wrong on the fact that his decision was somehow clearly erroneous or not supported by the evidence. You know, as you've heard, there were two experts in this case, Dr. Sewell and Dr. Brandt. One expert had done this many, many times. That was Dr. Brandt. The other expert had never done it. The Court, you know, came into the case, heard the testimony, and concluded, for reasons that he made clear on the record, that Dr. Brandt's testimony was more compelling than the evidence. And he specifically found, you know, he specifically noted the fact that Dr. Sewell had no prior experience with the drug. And he specifically commented on Dr. Brandt's demeanor on the stand and characterized him as, I think, one of the best witnesses he had, most credible witnesses he had ever seen. So there was ample reason. Well, I think he was limiting it at least to the trials he'd had in the past year. Very much. That may be, Your Honor. But he nonetheless lauded Dr. Brandt as a very credible witness. And I think he described his testimony at one point as compelling. And, you know, the argument here is that the judge got it wrong because he conflated effort and risk. And I personally think that's a red herring. I mean, you can't – it's like if you drive from Pittsburgh to Cleveland in a snowstorm and you drive the same route in a sunny day, it's the same route, it's the same road, the same car, but you're going to be a lot tired after you drive in a snowstorm because you have to pay attention. You have to be careful. And it's the same issue here. Dr. Brandt testified about the dispensing process. There was no dispute what the steps were, but he testified that when you dispense this drug, each step has to be performed carefully and it has to be double-checked and it requires a lot of focus. And focus and attention are effort. I mean, they are the same thing. You can't pay attention to something. You can't carefully perform a series of acts without using effort. And the judge was persuaded by that testimony that more than minimal effort was required to dispense the drug. Dr. Brandt testified, and I think this was mentioned, Dr. Brandt testified that even though he's an experienced oncology pharmacist, it takes him 15 to 30 minutes to prepare a dose of this drug because this is a drug that has to be individually tailored for each patient that comes in. It's based – like many cancer drugs, you have to identify the dose based on body surface area. You do a calculation. You find the amount of the drug that you need to inject into the bag to make that concentration, and then you carry out these other steps to make sure that the injection is going to be safe and effective. And part of the reason for that, and the judge noted this in his opinion, is that this is a drug with a very narrow therapeutic window. If you don't do it exactly right, you could harm the patient instead of giving the patient a benefit. So for all those reasons, the judge, I think, was well within his rights to conclude that more than minimal effort on the factual presentation was required to dispense this drug. And I don't think there's really any merit to the notion he substituted toxicity or general problems with chemotherapy for the stipulated construction. The effort required is a function of the level of attention that is required to prepare this dose, and the judge found that, I think, in findings 24 and 29, and that was the testimony at trial. So, you know, the way that they approached this at trial was to focus on, you know, very few steps and to focus essentially on the comparison between a lyophilized product and a liquid concentrate product, and ultimately it was a failure proof on their part. This was the way they chose to present their case. There was, as noted, no objection to Dr. Brand's testimony about the risks inherent in the dispensing process. This was all in his report. It was exported as depositions. So there were no surprises here. There was no motion in limine. There was no argument that this, you know, for example, with respect to the FDA. Well, there was a motion in limine that you lost. It was our motion in limine. They didn't make them. My point is that they did not move in limine or otherwise suggest that Dr. Brand's testimony about what they call risks was inappropriate under the stipulated construction. This all came in. The judge weighed all the evidence, and he reached the conclusion that he reached. And I think, you know, what you have here is a garden variety appeal in a case where there was a stipulated construction where the judge held the trial, heard two experts, and came to the conclusion that one expert was more credible than the other, and that was Dr. Brand. And so I don't, you know, I don't think the rest of this, I think, is somewhat bordering on metaphysical. I mean, this was a case where the judge heard the evidence. He made his decision. He rendered his opinion. So the only other thing I wanted to say anything about, there was, and this did not come up during the argument, but there was a suggestion in the briefs that the judge shouldn't have relied on Dr. Brand's testimony because allegedly it was inconsistent with some testimony that he gave about some other drugs, not related to bendamustine, that he characterized as being ready to use. I think the judge in the primary drug was a drug called Neulasta, which is a drug that comes in a pre-dosed syringe. It's in a box. You take it out of the box. You attach the needle, and you're done. You're ready to go. I see your time has expired. I think we have your point. Mr. Garr has a couple of minutes for a bundle. Thank you. Thank you, Your Honor. With respect, I don't think there's anything garden variety about this case. The claim covers a ready-to-use liquid bendamustine-containing composition. That no longer exists under this decision because everyone knew and everyone agrees that bendamustine is highly toxic, but under the district court's decision in this case, and this is made clear on page 13 of the appendix, the only thing that matters is that this is a highly toxic chemical, and as a result of that, each step, that's what the district court said, renders this not ready to use. That not only is inconsistent with the district court's prior ruling in the celerity case, it renders the patent inappropriate, and my friend tried to push back on that, but their own expert admitted that no bendamustine product is ready to use under their understanding of this, and that was at page 5425 of the appendix. This Court repeatedly says constructions that rule out preferred embodiments are highly disfavored. This case, the construction adopted after trial renders the patent inoperable. Now, with respect to the statements, Your Honor, I would point you to this Court's decision in Tennis where it said that the repeated statements to the FDA that the limitations were met show how one of skill in the art would understand the claim to function, and that's on page 1362, and that's what defendants' repeated characterization of their own generic products as ready to use did. It showed the ordinary understanding of that term, ready to use, and that was not one that ruled out liquid bendamustine as ever being ready to use. Now, the snowstorm example is actually a good one, because the question in this case is not is it hard to drive in the snow or is it hard to drive, you know, in Arizona during the day. The question is someone driving in the snow, and imagine that there's a set of tires that makes that easier and a set of tires that doesn't. The person of skill in the art knows how to drive in the snow. Just as the person of skill in the art here knows all the dangers in using liquid bendamustine. But what made this product ready to use is it went from a cumbersome reconstitution process to a product that you just withdraw from a vial, put it in a dilution bag, mix it, inspect it, and it's ready to use. That and the district court's construction in this case, which renders the patent inoperable, is reconstituted in error of law and reconstituted in error of fact. We urge the court to approve. Thank you. We are adjourned.